I'll now take case number 17-30849, which we have a caption for Reyes v. Stiglaw. And let me find Mr. Crawford, we're in the go. Yes, ma'am. May it please the court, my name is Todd Crawford, I represent Nicole Reyes. There are two issues for the court's consideration this morning. The first one is whether the trial court erred in Granning-Stiglaw's motion for summary judgment on its status as a debt collector within the meaning of the Fair Debt Collection Practices Act. The second issue, which is secondary, frankly, is whether Judge Barbier, who was the second trial judge on the case, committed error when he reversed Judge Berrigan's previous decision certifying the FDCPA class. You would not reach the second issue unless, of course, you first found that the motion for summary judgment was inappropriate. So this morning I'll be spending the majority of my time addressing the propriety of Granning-Stiglaw's motion for summary judgment on the issue of its status as a debt collector. I don't think that the parties dispute to a large extent the at all that applies to the question of whether someone is a debt collector or not within the meaning of the FDCPA. Certainly, we may spin the cases a little bit differently to suit our interests, but the trial court's decision below turned upon his belief that the summary judgment evidence that we submitted on cross motions for summary judgment was inappropriate summary judgment evidence, and I don't see how that's possible given that the evidence that we relied upon was the same evidence that Stiglaw relied upon. And very specifically, Stig submitted a total of three affidavits, two affidavits from Randy Optowski and one from a paralegal named Nicole, I've lost her name, Janay, excuse me. So I'll call her Ms. Janay before I forget her first name again. But so they had those two affidavits, and attached to Ms. Janay's affidavit were billing records, which Stiglaw identified as the number of files that it had pertaining to debt collection activity. And then they took that and calculated a percentage of revenue and submitted that to the court and said essentially, well, for 2010, 2011, and 2012, the amount of revenue from debt collection activity constitutes 1%, 1.1, or 1.3% of our total annual revenue, and so that's insufficient for us to be a debt collector as a matter of law. And that's really what their argument was. And so what we did Let me ask you to make sure I have an understanding of this law firm, although the other side would have a better understanding perhaps. The 1.5% was the debt collecting aspect. Was all of that for condominium associations or involved with condominiums? Yes, sir. What they submitted was a hundred And I understood. And so what was their percentage of overall work that was condominium-related insofar as the dispute of that? Only all that they submitted, Your Honor, they didn't give all of the bills for all of their condominium work. The only thing they submitted, and I'll invite you to look at Exhibit A to Janae's affidavit, and I know you said you wanted some citations, but if you just look on page 18 and 19 of my brief down in the footnotes, 51, 52, and so forth, you'll have very specific citations to the record on that issue. You'll see that the names of the billing files, okay, are things like collection of unpaid condominium fees, okay, unpaid condo fees, you know, they're all collection of this, collection of that. And so this idea that they've tried to spin later by saying, oh, wait, this really isn't for collection of fees, that's the name of the file. It's the name attached to your billing record. This is what we called it. Okay, so what we did upon receipt of this affidavit is we just took their billing entries. Now, they redacted the description of the billing entries from their bill. They said that's attorney-client privilege. We're not going to tell you the substance of what it is that we did on a given day. But they left the date, and they left the initials, and I think they left the time frame. But you can look at the exhibit. But even if you took all of those together, it's still no more than 3.5 percent, right? It's actually less than that, ma'am. It's about 1.3 percent of their revenue. But what I did was, because there is no bright-line rule test, let's just put it on a calendar, okay? And I literally put their time entries on a calendar. And what you end up with in a period of less than three years is 1,049 separate time entries where they're billing time to a file that is called collection of unpaid condominium fees. Well, let me ask you a question, though. You do acknowledge that there were only 34 liens placed in that period. There were, I believe, 36 letters sent. There are 34 liens filed. There are some lawsuits filed as well, and we attached those. And that's a separate. And, Your Honor, we created, just so we're clear about something, I don't want to create confusion, we actually submitted two different summaries of our evidence, if you will. One of them was based on the billing records that the Stig Law Firm submitted, and then the other one was based on public records documents, such as, for example, the lien letters that we had, what Stig calls lien letters, a collection letter, and we attached each one of those. There were 66, I believe, in the two-year period before, and I think there were 35 or 36 in the one-year period of the actual lawsuit itself. Then on top of that, there were 34 liens, but if you're actually assessing whether that's a debt collection activity, they have to prepare the lien, then they have to meet with their client to execute the lien, and they have to file the lien. So I understand we're talking about 34 liens, but in terms of ongoing debt collection activity, it's not a snippet in time, if you will. But aren't these ongoing established clients, these condominium associations, they're not just doing random collection work. These are their clients. Well, in the sense that are they doing more for them than only doing debt collection, yes, I absolutely agree with that, Your Honor, and I'm not saying that Stig Law is a debt collector in the sense of they are akin to a debt collection service. My argument has always— That's not what you're saying. Well, no, ma'am. I'm sorry, I'm not. What I'm saying is that the second test is—well, I'm about to—it's not substantial. It's a portion of the work that you do related to it, and this Court has even said that 0.5 percent of your revenue is enough to constitute being a debt collector within the meaning, and that is the Garrett v. Derby's case. The Court also, in the Hester v. Graham-Brighton-Smith case, kind of summarized what the law is in the Fifth Circuit for purposes of whether someone is a debt collector. But what I think is really interesting is the Hester case sided with approval to the Goldstein case from the Second Circuit, and the Goldstein case actually involved a law firm that had revenues, gross revenues of only $5,000 against total gross annual revenue of about $10 million. Of course, the statute says that taking action to foreclose a lien is not debt collection. Well, Your Honor, I addressed that very specific issue in my rebuttal brief, and I cited to case law saying respectfully that whether you're — if you're foreclosing on a mortgage or you're acting on a lien, that's still debt collection activity within the meaning of the statute. And I would direct you to my brief on that. If you want me to, I'll give you the precise page. It's in my rebuttal brief, though. I think it's more — well, I read your rebuttal brief, and I think it's more a question of what the collection letter says. Well, Your Honor, I think there's no question the debt collector — the letter, every letter says we're here to collect the debt. And I even underlined it in my brief in a footnote for you. I mean, it literally says — some of them even say this is a letter from a debt collector. But to address the question that you just raised in the Glaser case, for example, on page 21 of my rebuttal brief, quote, every mortgage foreclosure, judicial or otherwise, is undertaken for the very purpose of obtaining payment on the underlying debt. I know that, but I'm just saying I've looked at this issue before, and the case law draws a very fine line because foreclosing a lien is specifically exempted from the FDCPA because it is a property right. It's collecting on a vested property right. Except, Your Honor, in this case they were actually pursuing a personal judgment. In the end, what they did — Well, that was a question that arose in my mind because it didn't seem totally clear from your brief. Well, I apologize. I'm sure I could have been more clear on that point. But what I do want to get back to, though, is this idea, because the district court said, well, I can't even consider this calendar of events that you've prepared based upon the billing records because you're inviting me to assume that this is related to debt collection, except that Stiglal's own affidavits very specifically said, hey, here's our billing records pertaining to files that involve debt collection, and here's our calculation of the percentage. And, of course, on top of that, the names of the files very specifically say it's for the collection of unpaid dues. Yes, but if you have these 1,000 entries and each of them is a series of events connected with ultimately 34, 36 liens, then the most you can say they're doing is demanding payment and so forth in 34, 36 matters. But the question is not how many matters. It's are you doing it regularly. No, that's not — Regularly means — well, regularly doesn't mean how many e-mails do you spend. It ought to mean that's not the way the other cases have done it. Well, what the cases actually say is there's no bright-line test. Each case has to be looked at on a case-by-case basis. And, you know, they give exemplary factors that you can consider, but there's nothing to suggest that you can't look at literally how often somebody is engaging in debt collection activity. And in this case, it's more than once a day. I'm just saying the distinction is that if they had a flat fee for sending out a letter and threatening a lien and handling the foreclosure or lawsuit if need be, if they sent out one letter, then there would be 34 such letters, and that would not be regular. But the fact that they took different actions on different dates and billed them separately in the hours makes all the difference. No, ma'am, I'm not saying that at all. What I am saying is that what regular is, okay, absolutely unequivocally, if it's more than — in the Goldstein case, more than .05 percent was enough, okay? And they actually had 145 letters in less than a year's time. If you actually take a look at — That's about almost five times this. But that's just the liens, ma'am. If you address the letters, which is one thing, and then you have the liens, which is separate debt collection activity. It is separate debt collection activity because one is a letter and one is filing a lien. You're telling me you're skeptical just because you're, you know, that at the most you had three dozen tenants who were on the hook, right? Well, they're not tenants. They're owners. They own the property. I'm sorry. That's correct. That's correct. I believe that to be approximately true. Yes, ma'am. But on the other hand, the question is not how many people were involved, but how much or how regularly is the debt collection activity being engaged in. And I don't think there's any question but that the Sieg law firm was regularly engaged in debt collection activity as reflected by their own time and billing records. Does the Court have any questions for me at this time? Not for me. Thank you, counsel. I'll step in and listen. Thank you. Okay. Thank you. Mr. Baer. Good morning. May it please the Court. Andrew Baer on behalf of Sieg law and Margaret Glass. Despite what Mr. Crawford just said, I believe it is the opposite, that Sieg law does not regularly engage in debts. The affidavits that were submitted in the underlying case made that very, very clear. There is a lack of regularity on Sieg's part in the collection of debts for their clients, much less debts that would fall under the FDCPA. I believe the big misconception that Mr. Crawford employs in this case is that the assumption that a collection in and of itself automatically qualifies as a debt collection. Sieg law in and of itself is a real estate firm who treated or took care of the legal needs of the various condominium associations. The entirety of their collection work was incidental to the work it performed for those condominium associations. It was a simple matter of not letting the work walk out of the door when you had a client there who you provided ample amount of services to and then needed something incidental, such as some sort of collection work. Now — Did the firm collection work for any other clients? No, ma'am. Any other established clients? No, Your Honor. The debt collection, I believe it's in Mr. Apatowski's affidavit. The debt collection was in all collections solely related to condominium associations. So you did it in lieu of referring your good client, your established client, to another — Competitor. Yes. Exactly. You hit the nail on the head. Now, the other misconception that Mr. Crawford applies is that all of these actions that resulted in some sort of collection, whether collection for fees or some sort of aspect that resulted in Stiglaw pursuing money on behalf of condominium associations was, in fact, a debt — or a debt collection action under the FDCPA. The FDCPA defines debt very narrowly. It's not every type of collection that comes into play. It is not, for instance, things such as leaky faucets, fines for unruly neighbors or speeding in the parking lot, things that are levied against individuals for penalties for violating homeowners' bylaws and what have you. Does Louisiana have a condo property rights law? They do. They have a Louisiana Condominium Associations Act that governs the — I'm not sure to the extent of what it governs how far the bylaws can go. I do know that with respect to this case, the Louisiana Condominium Act, and you've jumped on something I was going to get to, the Louisiana Condominium Act requires prior to the collection of any fees or assessments or costs related to violations by your tenants to send out a letter, such as the letter that was sent here, in order to file a lien in order to enforce a security interest. And despite Mr. Crawford's contentions as to that, this — the filing of liens did not constitute debt collections. Now, Steele Law in its analysis of its revenue and whatnot relating to its regularity to show the irregularity included in instances the actual liens that were filed to enforce security interests. But, Judge Jones, you've hit the nail on the head as well. Per se, filing a lien or enforcing a security interest is not debt collection under the FDCPA. So what it really boils down to is that there is a lack of regularity within Steele Law's debt collection practice, which is purely incidental to its overall practice for the condominium associations. Would foreclosing — I'm sorry. Go ahead. Would foreclosing on a lien you filed be debt collection? I would assert that it depends on the nature of the debt, and no. Under the FDCPA, the way the statute reads is that enforcement of a security interest in the filing of a lien can qualify as debt collection if it's — if it essentially qualifies as an unauthorized or bad practice in trying to collect that debt. Essentially, you're trying to use a lien or threatening a lien when you don't have a property right in that — or an interest in that thing you're trying to foreclose upon. Well, don't the — I mean, we don't have to get to that issue here, do we? No. Because, I mean, when I looked at it, some circuits had held rather broadly that if your notice of lien foreclosure says you have the option to either pay up or we're going to foreclose on your lien, that that might, in fact, require the compliance with the FDCPA. In some circuits, yes, but when — in this instance in which what we're talking about, and I believe we've cited the cases in our brief, when it's a prerequisite — I believe it's the Schmidt case that we follow. When you have to file a security or an enforcement document or a lien in this type of situation, it is not going to qualify as debt collection in and of itself. It has to meet the standards of 1692F6. That doesn't apply here, so we don't get into the ambit of liens being debt collection. But I want to stress to the Court that the numbers that are before you with respect to the billable hours and, I believe, the revenue, those percentages anticipate if you include the lien amount in there, you still don't meet debt collector status. You're still below the threshold. One of the big points that has come up in this case throughout the entirety of the litigation is the analysis of percentages with respect to regularity. I would assert to the Court that looking at, as Mr. Crawford said, a blanket percentage is inappropriate. And the Argentieri case that we have cited in our brief puts this explicitly well. When you look at a percentage, the percentage has to take into account the size of the firm and the numbers that you're anticipating in reaching that decision. So, for example, in the Garrett case, there is an exponentially large amount of actions that are taken. In the Hester case that Mr. Crawford himself cited, there are over nearly 1,000 instances that the Court considered when you total everything up of debt collection within a one-to-two-year period. We're not talking about that in this scenario. And as the Argentieri case says, when you have a smaller firm or a smaller entity who's engaging in a small number of actions, they may technically end up with a higher percentage that would beat someone like a Wells Fargo who has thousands of employees and engages in thousands of actions. The bottom line for Stiglau is Stiglau took a very small number of actions as a very small firm. So the 1.5 percent, the revenue numbers, all of these numbers show that it's a small firm who has a very small percentage as opposed to a large firm with a small percentage. I believe the number that Mr. Crawford threw out was in the point — Sotomayor, you mean small means really small. Yes, ma'am. Yes. It's not a situation where you can be deceived by a small number because it's hidden — you know, it's not 1 percent of 10 million, for example. So where the numbers lie in conjunction with the small size of Stiglau, it's very distinguishable from the cases that the plaintiffs rely on or the appellant relies on, which are these large firms and these large companies with a large book of business and debt collection that is not, in fact, really that small when you put the percentages out there. One of the things that Mr. Crawford addressed was he stated that he was not trying to treat Stiglau as though they were akin to a debt collector. That is what is required to show Stiglau as a debt collector under the FDCPA. When the FDCPA was first enacted, it had an exception for attorneys, and once attorneys began engaging in the practice of debt collection in direct competition with those traditional debt collectors, the amendment was enacted that included the inclusion of attorneys under certain circumstances. But as we brief, the importance of that point was to add attorneys into the FDCPA when they were akin to your traditional debt collectors. It was not anticipated to say any attorney who comes in and subsequently engages in some debt collection suddenly becomes a debt collector. There needed to be that nature where you have an attorney who is working almost as though they are solely a debt collector. And that is not Stiglau's case, as the record makes clear. This was incidental work as a result of prior condominium association clients. Another thing that Mr. Crawford addressed was that he was not clear how the court or any court could determine that the evidence that was put before Judge Barbier in the summary judgment was not competent summary judgment evidence. The summary evidence that was presented by Mr. Crawford in opposition to our summary judgment and an advancement of Ms. Ray's cross-summary judgment was based purely on interpretation and unilateral decisions made by Mr. Crawford in creating a document. It was a document where one of their attorneys went down and reviewed mortgage and conveyance records, and if they saw a lien filed, apparently, they said this is debt collection. If they saw certain transactions in the mortgage and conveyance records, they unilaterally determined this is debt collection. Mind you, Stig is a real estate firm. Stiglau is a real estate firm, so they are rampant in the mortgage and conveyance records as a filing party. Any time Stiglau fell into a certain circumstance or was found to have filed anything on behalf of a debt collector, I mean a condominium association, they identified that as debt collection. Subsequently, when the ledgers of the various condominium associations were reviewed, I mean, any identification on those ledgers where Stiglau was paid financial compensation for attorney's fees, Ms. Ray has said this is debt collection. And that ---- A bunch of the entries, according to them, did say collection activity, collection activity. On some of the billing, the title on some of the billing invoices did say that, but I want to stress to the Court that not all of the collection that was done on these condominium associations related to debts under the FDCPA. Right. So you're saying some of them was unauthorized pets or ---- Right. I don't know if ---- Someone, I believe someone got unruly and they ran in their underwear through the common area and they were fined. That's not a violation of the homeowner's assessments. There was a speeding incident in the parking lot. There were people who installed non-code items in their, in their condominiums. Those are analyzed in our numbers as though assessing them as collection, we would still hit these numbers, but that's not debt collection under the FDCPA. What kind of money are you talking about here? Were these fees paid? The fees were never paid directly to Stiglau. They were paid to the, either a property manager or the condominium. They were paid. In other words, what did the plaintiffs want? In the underlying case, at one point there was a seven-figure demand. We ---- Just based on the fact that there was a violation, not based on the amount of fees paid? No. So the violation of the FDCPA against Stiglau, yes. There were also pending usury claims that were ultimately settled against other parties. Stiglau's was dismissed in the summary judgment and has not been appealed. But it was a variety of issues. Essentially, this all started, from my understanding, Ms. Reyes had a dispute with the condominium association that prolonged and at some point it became a tipping point. She filed suit and we ---- What kind of money is she looking for? From us, it was not for ---- I don't remember the specific number. I remember it was at least six figures at some point, but toward the end. But from us, it was violations of the FDCPA, penalties under the FDCPA for basically receiving a page-and-a-half letter saying to receive ---- Well, that's the way the statute works. But its penalty, isn't there a monetary penalty in the statute plus attorney's fees? Yes. Something like that. Yes, Your Honor. So it was that plus attorney's fees, I believe, was encompassed. I don't remember the specific numbers. What about the class action allegations? The decertification, we assert, was proper. Initially, it's an abuse of discretion standard that Judge Barbier is held to in order to determine whether or not he should have decertified the class. I believe the history and the certification itself is important. When this first came up for certification, there was an assessment and assertion from the plaintiff that I believe was 65 individuals and they believed they could find more. All along, the condominium associations and Stieg Law were able to say, look, specifically the Stieg Law for the FDCPA component, it is a minute number that will be under 25 people and that will also include corporate claimants who are not proper parties under the FDCPA. The FDCPA solely applies to natural persons. So that was met with, no, we were told that's not the case. So certification occurred. And then throughout this litigation and the ensuing years, no one ever came to light beyond the 25 that we had said all along were there. We believe and assert that the 25 individuals who can be readily identifiable while there might be some geographical restrictions do not meet the numerosity requirement. They, we essentially, if they still lived in the condominiums, they still had their addresses in the letters. This was not a situation that required numerosity to be, numerosity was not met under the circumstance. And while Mr. Crawford takes issue with the decertification, the decertification essentially was a reevaluation of the prior assessment that there would be a large number of plaintiffs under the FDCPA. That just didn't come to fruition and it was never the case. It was certified by Berrigan, right, not Barbier? Yes, yes, Judge Berrigan certified it. And when you read her opinion, it's very much a, look, the representation is that we're going to find all these plaintiffs at some point in time. That just never, that never happened. But we understand that the initial certification on the basis of future discovery just, it never came to light, particularly after that initial certification motion. We had a number of plaintiffs, a number of claimants dismissed because they were, like I said, non-natural persons. You had corporations, there was a West Monroe attorney who has a couple of condominiums in New Orleans for marketing events and bringing clients down to show them the sites. So the decertification, in addition to just being an abusive discretion standard, just doesn't meet the numerosity requirement. And we believe that was properly maintained. One of the issues that was brought up in the briefing, in the reply brief specifically, that I wanted to address was the allegations of consistent and perpetual hiding of discovery and noncompliance with production of documents. One of the arguments that was asserted was that because of a noncompliance with the discovery rules, Stiglaw should not have been able to introduce any evidence in furtherance of the summary judgment. The documents that are complained of were produced and provided to the plaintiff in September of, I believe, 2015, and that was on Record Docs 7839 and 7867. I know that was something that popped up in the reply that I wanted to address. However, in addition to that, that argument was not raised below. There was the objection to the affidavits that were put forth for impersonal knowledge and one other grounds, but not anything related to noncompliance with discovery at that point. We assert to the Court that Stiglaw did comply with discovery, and Judge Knowles and Judge Barbier both found that it varied multiple times in this litigation. But regardless, that claim has, in fact, been waived by not being pled below. I think you've covered everything that he mentioned in his argument. I think so. Unless the Court has any other questions for me, I'd be happy to sit down. Let's not. Thank you. Thank you. Mr. Crawford. Just to respond briefly to the discovery issue, Your Honor, I wasn't complaining about discovery. I raised the issue of Rule 37, which is you have a mandatory obligation to produce documents that you're going to rely upon as your defense. They did not produce those documents. What he's referring to is what he produced in September of 2015 was his opposition to our original motion for summary judgment. At that point in time, we filed a motion over two and a half years after the case had been filed and said, look, they don't have any evidence to support their contention that they're not a debt collector. And when they tried to come forward with these affidavits and the billing records, we moved to — we objected to them specifically at that point and said, wait a minute, Rule 37 requires automatic exclusion of this. So that's where that came from. This was not something that — and it wasn't an oversight on their point because we asked for the same material, and they objected and refused to produce it. So I want to address that. One thing I didn't raise earlier and I intended to was the trial court specifically accepted at face value Randy Optowski's suggestion that the Stieg firm did not actively solicit debt collection activity or debt collection cases from the condominium associations, but the Stieg law firm website actually includes an article authored by Mr. Optowski, and the name of it is News You Need to Know, Collection Tools for Condominium Homeowners Associations. So on their website, Mr. Optowski has authored the article on how to collect these very specific things. What's wrong with that, telling your client how your client can do things? It's okay unless you tell the judge we don't do that. You can't tell the judge I don't solicit this type of work and then put it on your website. Well, that goes to the substance of what the advice is, not to the title. What I'm saying to you is that we have to do it. Collection tools can mean many things short of hiring my law firm in order to — I mean, law firms do this all the time, right? I think — well, not for purposes of summary judgment, no, ma'am. I think that raises a material issue of fact. If you say, no, I don't do this, and yet here it is on your website, and you're saying this is what I do, please hire me, I think, frankly, that's a material issue of fact. There was a lot of issue on this whole small versus large in terms of the cases, and I will tell you that the cases that they generally cite for the proposition that this is a small law firm usually involves one or two people at most. The Goldstein case, that firm had $10 million of annual revenue and only $5,000 of revenue from debt collection activity. So you had a tiny percentage, and that was still sufficient to give rise to debt collection, to being a debt collector. On the issue of Judge Clement's question, which is, you know, you're either a debt collector or — you know, that's what you're saying. You know, if you look on page 33 of my brief, which quotes the Garrett case, clearly Congress must have intended the principal purpose prong of section 1692A6 to differ from the regularly prong. A person may regularly render debt collection services even if these services are not a principal purpose of his business. Indeed, if the volume of a person's debt collection services is great enough, it is irrelevant that those services only amount to a small fraction of his total business activity. The person still renders them regularly. So there's a distinction between your principal purpose is to be a debt collector versus you engage in debt collection activity on a regular basis. Is it your regular basis? Do you regularly file suits under the FDCPA? No, ma'am. No, ma'am. This was the single most offensive thing I had ever seen in my entire life. Literally, Nicole Reyes, as far as somebody engaging in overreactive, crazy type of activity, she had a single late payment for $100, and they blew that up to $4,000 while she paid consistently her fees. So from $100, they doubled that every month and kept adding late fee on late fee on late fee. And because of the Stig law firm's encouragement, they unilaterally imposed fees that were actually greater than the late fees, $600, $400, $1,400. Why didn't she pay it? Because she disputed it. It was illegal. She hired me, my law firm, and we wrote to them. And to be honest, after we had a letter of representation, said this debt is disputed, directed to us, the Stig law firm sent another letter directly to her, which is a separate violation of the FDCPA. So I apologize if I get emotional on that, but it really offended me personally to my core, and I thought if I was going to do it for Ms. Reyes, I might as well do it for everybody. Well, okay. That's it. Any other questions, ma'am? Okay. Thank you. Thank you.